Mr. Melloni presents substantial evidence to support his claim, and that evidence supported his complaints of pain. The medical evidence does not have to fully corroborate the complaints of pain. The claimant need only show underlying impairment that is reasonably likely to cause the pain. And I was shown here, you know, the Mr. Melloni had massive brain surgery in 1972 in the Dominican Republic. And the report by Dr. Ney Arias of that October 1672 procedure indicates that although the surgery was successful, Mr. Melloni had difficulty in reading. Mr. Melloni testified that he had to learn how to read and write after that surgery. During his hearing in 1995, he talked about getting sick. And he was in bed for about three or four weeks. In the 70s, in 1986, he was, you know, bedridden for four to five months. He started seeing Dr. Hidalgo Solis in Costa Rica in 1986. Dr. Hidalgo Solis treated him from 1986 to approximately 1991. He's a general practitioner. Mr. Melloni was also here in San Francisco when he was seen by Dr. Wilson at UCSF. Dr. Wilson conducted an EMI scan which showed the old area of softening in the left cerebral hemisphere. And the softening, he said that the softening correlates to residual difficulties. The appellant, Mr. Melloni, started seeing Dr. Celadon Barantes in Costa Rica approximately in 1990. He first complained of gastric pains. And Dr. Barantes continued to treat him. In fact, treated him various times in 1991 for arterial hypertension. And Dr. Barantes stated that the hypertension related to the 1972 subdural hematoma. And he noted the difficulties with reading and writing that Mr. Melloni was having. The appellant, by the beginning of 1993, started having some problems. I think it was Sabatini and Dr. Tervisan were both in the neurology department, as well as Dr. Limonia, who was a neurosurgeon. There was a CEP done to There was a 94 MRI by Dr. Monelli which documented that. There was growth in his brain, even though there was a cavity from the 72 surgery. Despite the and said that Mr. Melloni suffered the blood clot left side brain in 1972 with continuing residual symptoms, including reading and writing. And that there's abnormality, as the MRI showed, in the left side of the brain, which would impair language skills, verbal comprehension, verbal expression, and reading and writing. Mr. Melloni was seen by a neurosurgeon in Costa Rica in 1990 and 1991, Dr. Guido Molina, who confirmed that he was indeed having problems with reading and writing. Mr. Melloni's 1991. He was ordered to stop working because any kind of stress was seen by Dr. Berantes to lead him to either have a heart attack or a stroke. And that was noted by Dr. Berantes in his record. And what's the precise date before which the disability must begin in order for him to be covered? It's sometime in 1991, but what's the precise date? Correct, yes. What day in 1991? Anytime in 1991. Yes. But he was ordered to stop working in August. Mr. Melloni testified during the two, I think in both hearings, that he tried to work and he couldn't work into October. He couldn't work by November 1991. Well, wasn't October 1st the onset date? Yes. In the first hearing, he testified that he couldn't work into the day before his birthday in 1991. His birthday was August 26. And in the first hearing, the onset date was moved from the beginning of 1991 into August 25, the day before his birthday. The ALJ hired an internist to appear at the hearings. The internist acknowledged that Mr. Melloni had a thinking dysfunction and that it was remarkable for such a young man to be able to have two brain hemorrhages. But he didn't know what caused the symptoms of October 91. In fact, he couldn't answer when I asked him, are you familiar with the effects of the softening of the brain on a human body over time? He didn't answer that question. The ALJ, during the first hearing, said that he never suggested Mr. Melloni was not fully and totally credible. In fact, he said that even if he should find not in Mr. Melloni's favor, there would be no reflection on his credibility, on his truthfulness. As we said in the briefs, the substantial basis for Mr. Melloni's claims of pain, and it was error for the ALJ to discount that, relying on what the internist at the hearing said. What the internist said at the hearing was not substantial evidence because there was no basis for it. There's numerous accounts. In fact, the medical records are consistent from 1972 to 1999 of the objective. Well, 1999 is not the closing date, right? I don't understand what you mean, Your Honor. Didn't his coverage terminate on December 1991? Don't we have a window between October and December? The window was into he had to show eligibility as of 1991, Your Honor. That's right. In terms of the medical evidence. Between October 1st and December 31st. Well, if you want to look at it that way, Your Honor, but he's not limited to show evidence for just that particular period. No, but he must show for that period. He may not be limited to that period, but he has to show for that period. He did show for that period, Your Honor, with the records from specifically the neurosurgeon, Dr. Guido Molina. So by an examination in 1999, a physician can tell you that this incident started within a three or four month bracket back in 1991? I'm not saying that, Your Honor. Dr. Guido Molina examined him in 1991 during that period. In fact, he saw him on October 9th, 1991 and October 16th, 1991. If you were to look at Dr. Guido Molina's documents. You know what, let's do I think we've got your argument quite well in hand. Let's hear from the other side. Thank you. And then we'll give you a moment. Thank you. Good morning, Your Honors. My name is Lorna Lee. I'm appearing on behalf of the Commissioner of Social Security. Substantial evidence supports the ALJ's decision that the claimant was not disabled prior to his date last insured, December 1991. In order for the claimant to be found disabled here, he must show that he became disabled prior to 1991 and was continuously disabled thereafter. The claimant has not met his burden of proving that his alleged physical impairment prevented him from performing basic work activities prior to December. I'm having a little trouble hearing. If you could speak up, I would be assisted. Claimant has not met his burden of proving that his alleged physical impairments prevented him from performing basic work activities prior to December 31st, 1991 and continuously thereafter. The ALJ properly found that the medical evidence for that relevant period did not establish the existence of a medically determinable impairment, which would have prevented claimant from performing basic work activities. He correctly relied on the opinion of the medical expert, Dr. Coleman, who thoroughly reviewed the medical evidence and claimant's testimony and testified that there was no physical impairment. There was no objective evidence in the record for that relevant period. There are two reports that were made in 1991. Dr. Hildago Solis from Costa Rica, and that's in the excerpts of records, page 407, volume 2. Dr. Solis, according to the medical expert, and the medical expert actually goes through Dr. Solis' opinion or report in detail. If you look in the excerpts of records on page 303 and 304 in volume 2, the medical expert does discuss Dr. Solis' report. And basically, he points out that there are no medical findings in Dr. Solis' report. He does indicate two findings, two basic findings, which really doesn't say anything according to Dr. Coleman. A blood pressure reading of 160 over 110, which is considered high blood pressure, and, quote, a big loss of muscular energy that Dr. Coleman indicated really doesn't mean anything. There was no neurologic examination performed by Dr. Solis. He made no diagnosis. He did no testing. He referred Coleman to go see a neurologist or some other specialist, but apparently, Coleman did not do so. There were no follow-up examinations. There were no hospitalizations. There is simply no medical findings in Dr. Solis' report. The other medical report for the relevant period was made on November 1, 1991, and that appears on page 140 in volume 2 of the excerpts. And that report was made by Dr. Berantes. Page 140? Yes. I'm sorry, that's volume 1. I'm sorry, volume 1. And in that report, Dr. Berantes gives basically a medical history, Coleman's medical history. He did suffer a cerebral hematoma back in 1971, for which he received brain surgery in 1972. But I think Your Honor should keep in mind that Coleman worked productively in a highly skilled professional job as an international banker for almost 20 years following his surgery. And the 1991 reports do not support any type of impairment, and under the regulations, Coleman must show, Coleman was established by the medical evidence that there was a medically determinable impairment, and he does not do that here. Based on the two 1991 reports, according to the medical expert, they simply say nothing. There were no medical findings. There were no examination findings. There were no test results. Dr. Berantes in 1991 simply gives Coleman's medical history in the case that Coleman does have hypertension, which he prescribed medications. And Dr. Berantes saw Coleman on three other occasions in 1991, in February, August, and October 1991. And at that time, he simply prescribed medications. Three types of medications. One used to treat hypertension. The other was a non-steroid anti-inflammatory drug. And the other was to treat symptoms of just an antihistamine that could be used for a variety of ailments, including symptoms of dizziness and nausea. But the two reports in 1991, again, according to the medical expert, showed no significant medical findings. And based on those two records, the medical expert testified that Coleman simply has not shown that there was a medically determinable impairment prior to his date last and short of December 31, 1991. And also, if you look at the record subsequent to 1991, there are no medical records in 1992, which indicates that Coleman did not receive any medical treatment at that time. So not only did he not show that he was disabled prior to 1991, but he was not continuously disabled after that time, since there was a gap in treatment. And really, there was nothing until 1993 when he suffered his brain hemorrhage. And even at that time, he was hospitalized for 10 days and was released with a clean bill of health. I mean, there were no neurological deficits noted. And basically, the attending physician indicated that he should just follow up with his regular doctor. And so Coleman is ‑‑ Appellant is simply relying on retrospective opinions. These opinions are dated 1995, 1998, 1999. And these doctors saw the claimant once or maybe twice, and I don't think it's reasonable to relate back to 1991. These records are simply ‑‑ came simply too late, and it should not be considered to ‑‑ should be used to establish that claimant was disabled prior to his date last and short. With respect to the issue of credibility, Your Honors, the claimant must establish by the medical evidence that he had a medically determinable impairment, which could reasonably be reasonably expected to cause his alleged symptoms. And because there are no medical findings in the record, he has failed to do that. Do you think this is a credibility case or a failure to meet the burden of proof? Failure to meet the burden of proof, clearly. Well, I thought you were discussing credibility. Well, just to address the appellant's argument. Thank you. Yeah. Should I continue? Yeah. If you have further to say, yes, otherwise we're ‑‑ To address claimant's issue of credibility, as I indicated, the claimant did not establish the existence of a medical impairment which could reasonably be expected to produce the symptoms he alleged. I don't think you need to worry about the credibility. I think we see this as a burden of proof question. Okay. Thank you, Your Honors. Thank you very much. Would you like a minute in rebuttal? Your Honor, the ‑‑ Mr. Maloney provided a proof that he had. In fact, there were two hearings between 1999 and 1995. He came up with more documents he could find in various countries where he had been. He traveled internationally as a banking consultant. But the evidence presented reflects why he became disabled in 1991. The records from Dr. Guido Molina showed that between 1970 and 1991, he had a gradual deterioration in concentration and memory, with increasing headaches and vomiting. And he had chronic fatigue syndrome. And the left cerebellum hemorrhage worsened his condition by increasing his loss of balance. And it gave him serious difficulties with reading and writing. That's what Dr. Guido Molina said. Dr. Nerias, when he released Mr. Maloney in 1972, said that the difficulty in reading caused some anxiety and limitation on Mr. Maloney's working capacity. He told Mr. Maloney that this slight difficulty will probably clear up in time, but he went up and down. Okay. We're at the end of the minute. Do you have one last sentence or two? Okay. He had this buildup in his brain that disabled him in 1991. And it caused another hemorrhaging in 1993. I think we understand the positions of both sides in this case. Thank you, Your Honor. Thank you very much for the argument on both sides. The case of Maloney v. Barnhart is now submitted for decision. The next case on the calendar, Kahn v. Ashcroft, has been submitted on the briefs. We've got two remaining cases on the argument calendar. The first of those two is Valencia Vieta v. Ashcroft, and then we'll finish with Gonzalez de Martinez v. Ashcroft. First one, Valencia Vieta.
judges: Alarcon, Beezer, W. Fletcher